FILED

2014 Jan-14  PM 02:35
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| CLARK MEMORIALS OF ALABAMA INC., | ) ) ) | |
| Plaintiff; | ) ) | |
| vs. | ) ) ) | 2:13-cv-01356-LSC |
| SCI ALABAMA FUNERAL SERVICES LLC d/b/a ELMWOOD CEMETERY AND MAUSOLEUM, et al., | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OF OPINION

Plaintiff Clark Memorials of Alabama, Inc., brought this action, alleging violations of the federal and state antitrust laws along with various Alabama state law torts. Before the Court is Defendants' motion to dismiss Plaintiff's complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. 7.) The parties have fully briefed the motion, and the issues are ripe for decision. For the reasons stated below, the motion is due to be granted.

## I.    Background[1]

Plaintiff Clark Memorials of Alabama, Inc. ("Clark") is a Birmingham, Alabama-based retailer of displays known as memorials that are placed at grave sites in cemeteries. Clark sells two types of memorials—"monuments" and "markers." Monuments are usually upright structures consisting of granite or marble. Markers are generally flat structures made from stone or bronze. Clark is an independent dealer, meaning that consumers can design and purchase a memorial from Clark but must purchase a burial lot from another entity. After a consumer purchases a memorial, Clark orders material from a quarry to produce the memorial. Traditionally, Clark has also offered customers the option of having Clark employees install the memorial at the cemetery. In order to install a memorial, a Clark employee prepares a foundation. This process involves three steps—the employee digs a hole where the memorial rests, fills the hole with a concrete mixture, and then places the memorial upon the foundation. Clark has both sold and installed memorials at Elmwood Cemetery ("Elmwood").

Elmwood is a cemetery located in Birmingham, Alabama. It was established in

---

[1] In a 12(b)(6) motion, the Court accepts the Plaintiff's allegations in the complaint as true and construes those allegations in favor of the Plaintiff. *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003).

1900, comprises roughly 500 acres, and provides a resting place for over 200,000 persons. Elmwood was ranked the 12th largest cemetery in the United States in 2002. Defendant Service Corporation International ("SCI"), a company that owns and operates cemeteries throughout North America, acquired Elmwood in 1987.[2] SCI sells interment rights at Elmwood. SCI also sells cemetery-related merchandise and services, including various types of memorials.

SCI owns nine cemeteries in Alabama through a wholly-owned subsidiary, Defendant SCI Alabama Funeral Services, LLC ("SCI Alabama," collectively the "SCI Defendants"). Four of these are located in the Birmingham metropolitan area. Managers at individual cemetery locations are supervised by divisional management, which receives direction, support, and resources from SCI.

Clark has traditionally been charged a fee by Elmwood so that an Elmwood employee could flag the location of the monument or marker before it is installed. Clark pays the fee and bills it to its customer. This practice predated Elmwood's acquisition by SCI. The SCI Defendants charged a $195 fee to flag each location of a

---

[2] Clark pleaded that SCI has a particular acquisition strategy focused on purchasing "heritage properties, [or] businesses known most commonly by the names of founding families. Part of its business strategy is to continue to operate the businesses under the former heritage names. In 1987, SCI acquired Elmwood Cemetery." (Doc. 1 at 5 ¶ 11.) Although this may be an attempt to suggest that Elmwood is a "heritage property," Clark never pleaded that Elmwood actually is a "heritage property" or that it continues to operate under a "heritage name."

monument or marker in 2013.

At some point prior to June 2013, the SCI Defendants began informing consumers that they would be charged installation fees if they purchased a monument or market from an independent dealer. On June 20, 2013, Defendant Timothy W. Rogers ("Rogers"), SCI's market director for Central Alabama, allegedly informed Clark that it was banned from Elmwood. Rogers instructed Clark to leave its memorials outside the cemetery, and SCI employees would install them. In June, SCI charged $300 in installation fees for a marker and $500 for a monument. On July 2, 2013, the Defendants changed the installation fees to $0.65 per square inch.[3] Clark contends that these decisions were part of a plan to develop an exclusive installation policy at Elmwood that would take business away from independent memorial dealers.

On July 22, 2013, Clark filed its complaint, contending that these practices are either monopolization or attempted monopolization, violating Section Two of the Sherman Act, 15 U.S.C. § 2 ("§ 2"). Clark also alleged that these policies violate the Alabama Antitrust Act and constitute interference with a contractual relationship, interference with business relationships, and interference with prospective economic

---

[3] The Court reads this as an attempt to allege a price increase. Clark pleaded that a typical four-foot monument with a five-foot base would cost $780 to install, and a monument with a ten-foot base would cost $1,560. (Doc. 1 at 8 ¶ 28.)

advantage under Alabama law. The Defendants have moved to dismiss this action.

## II.   Standard of Review

Rule 8(a) of the Federal Rules of Civil Procedure requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-679, 129 S. Ct. 1937, 1950 (2009). Instead, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Id.* at 678, 129 S. Ct. at 1949 (internal quotations omitted). *Iqbal* establishes a two-step process for evaluating a complaint.  First, the Court must "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679, 129 S. Ct. at 1950. Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* Factual allegations in a complaint need not be detailed, but they "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964-1965 (2007).

Antitrust claims are subject to the general standards of Rule 8 pleading. *See id.* at 554-555, 127 S. Ct. at 1964. Unlike factual allegations, the Court need not assume that a plaintiff's legal conclusions are true. *Chandler v. Secretary of Florida Dept. of Transp.*, 695 F.3d 1194, 1199 (11th Cir. 2012). The Court must construe pleadings broadly and resolve inferences in the plaintiff's favor. *Levine v. World Fin. Network Nat'l Bank*, 437 F.3d 1118, 1120 (11th Cir. 2006). Even though the Court must construe inferences in the plaintiff's favor it need not accept inferences that are unsupported by the facts in the complaint. *Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1320 (11th Cir. 2006). Ultimately, the Court must be able to draw a reasonable inference from the facts that the defendant is liable. *Reese v. Ellis, Painter, Ratterree & Adams, LLP*, 678 F.3d 1211, 1215 (11th Cir. 2012). In reviewing the plaintiff's complaint, the Court must "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950. To survive a 12(b)(6) motion, "[a]n antitrust complaint must comprehend a so-called prima facie case, and enough data must be pleaded so that each element of the alleged antitrust violation can be properly identified." *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 995 (11th Cir. 1983) (internal citations and quotation marks removed). As with other types of pleadings, "[c]onclusory allegations that defendant violated the antitrust laws and

plaintiff was injured thereby will not survive a motion to dismiss if not supported by facts constituting a legitimate claim for relief." *Id.*

## III.   Discussion

### A.   Antitrust Claims

Section 2 of the Sherman Act provides:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 2. The Sherman Act distinguishes between concerted conduct, which is covered by both sections 1 and 2, and independent actions covered only by § 2. *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190, 130 S. Ct. 2201, 2208 (2010). Thus, the antitrust laws treat "concerted behavior more strictly than unilateral behavior." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768, 104 S. Ct. 2731, 2740 (1984). This distinction "avoids judicial scrutiny of routine, internal business decisions." *Am. Needle, Inc.*, 560 U.S. at 190, 130 S. Ct. at 2209.

The prima facie elements of a monopolization claim require the plaintiff to

plead sufficient facts to infer both "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570-571, 86 S. Ct. 1698, 1704 (1966). "Monopoly power" means "the power to control prices in or to exclude competition from the relevant market." *Morris Commc'ns. Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1294 (11th Cir. 2004) (citing *U.S. v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S. Ct. 994, 1005 (1956)). To prove the second element, the plaintiff must show "predatory or exclusionary acts or practices that have the effect of preventing or excluding competition within the relevant market." *Id.*

To state an attempted monopolization claim the plaintiff must plead facts to suggest: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S. Ct. 884, 890-891 (1993). The intent and dangerous probability elements are related, as a plaintiff must show intent to monopolize to establish that there is a dangerous likelihood of monopolization. *Swift & Co. v. U.S.*, 196 U.S. 375, 396, 25 S. Ct. 276, 279 (1905). Clark contends that it has made out either a monopolization or attempted

monopolization claim. However, Clark has not alleged sufficient facts to state a plausible antitrust claim.

The starting point for both monopolization and attempted monopolization claims is analysis of monopoly power. To sustain a § 2 monopolization claim, the plaintiff must allege facts demonstrating that the defendant actually holds monopoly power. *See Grinnell Corp.*, 384 U.S. at 570-571, 86 S. Ct. at 1704. The plaintiff must similarly allege for an attempted monopolization claim that "the defendant comes close to achieving monopoly power in the relevant market." *Gulf States Reorganization Group, Inc. v. Nucor Corp.*, 721 F.3d 1281, 1285 (11th Cir. 2013). The Court's analysis of monopoly power involves two steps.

First, the Court must define the relevant market. This is a basic element of most antitrust claims because such claims center around an entity's economic power in a particular market. *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 994 (11th Cir. 1993) ("Defining the market is a necessary step in any analysis of market power and thus an indispensable element in the consideration of any monopolization or attempt case arising under section 2."). A well-pleaded market allows the Court to determine that it is plausible "a monopolist, cartel, or oligopoly in that market would be able to reduce marketwide output simply by cutting its own output, and thereby raise

marketwide prices above competitive levels." *Id.* at 995-996.

The relevant market is "a distinct market, with a specific set of geographical boundaries and a narrow delineation of the products at issue." *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns., Inc.*, 376 F.3d 1065, 1074 (11th Cir. 2004). The geographic boundary, called the geographic market, "is the area in which the product or its reasonably interchangeable substitutes are traded." *T. Harris Young & Assoc., Inc. v. Marquette Elecs., Inc.*, 931 F.2d 816, 823 (11th Cir. 1991). The Court must consider "[p]rice data and such corroborative factors as transportation costs, delivery limitations, customer convenience and preference, and the location and facilities of other producers and distributors." *Id.* The product dimension, or product market, "is defined in part by whether a group of manufacturers, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other." *Gulf States Reorganization Group, Inc.*, 721 F.3d at 1286 (internal quotation marks removed). "The reasonable interchangeability of use or the cross-elasticity of demand between a product and its substitutes constitutes the outer boundaries of a product market for antitrust purposes." *U.S. Anchor Mfg., Inc.*, 7 F.3d at 995  (citing *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325, 82 S. Ct. 1502, 1523 (1962)) (footnote omitted).

Second, once the relevant market has been defined, "[t]he prinicpal measure of actual monopoly power is market share, and the primary measure of the probability of acquiring monopoly power is the defendant's proximity to acquiring a monopoly share of the market." *Id.* at 999. Indeed, a low market share generally precludes a monopolization claim as a matter of law. *See Yoder Bros., Inc. v. Cal.-Fla. Plant Corp.*, 537 F.2d 1347, 1368-1369 (5th Cir. 1976) (finding that 20% market share in defined ornamental plant market was insufficient to establish a monopolization claim as a matter of law and was relevant to attempted monopolization claim), *and Sulmeyer v. Coca Cola Company*, 515 F.2d 835, 850 (5th Cir. 1975) (noting 22% of relevant market was insufficient to establish monopolization).[4] Measuring monopoly power is more speculative when evaluating an attempted monopolization claim, but the Court must still analyze concentration of power within a relevant market. *See U.S. Anchor Mfg., Inc.*, 7 F.3d at 994.

Predatory or anticompetitive conduct is also an essential element of both monopolization and attempted monopolization claims. *See Spectrum Sports, Inc.*, 506 U.S. at 456, 113 S. Ct. at 890-891 (attempted monopolization), *and Morris Commc'ns.*

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) , the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior close of business on September 30, 1981.

*Corp.*, 364 F.3d at 1294 (monopolization). Clark's facts regarding monopoly power are intertwined with the types of anticompetitive conduct it alleges—tying and unilateral refusal to deal. The Court examines each in turn.

### i.   Tying

A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *N. Pac. Ry. Co. v. U.S.*, 356 U.S. 1, 5-6, 78 S. Ct. 514, 518 (1958). These agreements are prohibited because "[t]hey deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market." *Id.* at 6, 78 S. Ct. at 518. However, not every refusal to sell products separately is an illegal tying arrangement. *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 11, 104 S. Ct. 1551, 1558 (1984). "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Id.* at 12, 104 S. Ct. at 1558.

Tying arrangements have been prohibited by multiple statutory provisions.

*Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 34, 126 S. Ct. 1281, 1286 (2006). "They have been condemned as improper extensions of the patent monopoly under the patent misuse doctrine, as unfair methods of competition under § 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, as contracts tending to create a monopoly under § 3 of the Clayton Act, 15 U.S.C. § 14, and as contracts in restraints of trade under § 1 of the Sherman Act." *Id.* Clark has brought its antitrust claim solely as a § 2 claim, and Defendants contend that tying arrangements are not punishable under § 2.

In some cases, the underlying facts that support a § 1 claim may support a § 2 monopolization claim. *See Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 482-483, 112 S. Ct. 2072, 2090-2091 (1992). Here, the Court need not determine whether the tying claim should properly be brought as a § 2 claim or a § 1 claim because Clark has not alleged sufficient facts to show a § 1 tying arrangement. *See id.* at 481, 112 S. Ct. at 2090 (noting that a § 2 monopolization claim requires a greater showing of economic power than a § 1 claim).

The Court reads Clark's complaint to allege two separate tying arrangements. First, Clark alleges that the SCI Defendants "are exploiting their control over the tying product (the burial lot) to force the buyer into the purchase of a tied service (the

installation of memorials)." (Doc. 1 at 14 ¶ 53.) Elsewhere, Clark pleaded that the Defendants seek to "exploit their dominant position in the installation of memorials market in order to then monopolize the sale of memorials market." (Doc. 1 at 12 ¶ 44(d).) Thus, for this claim the installation of memorials market is the tying product, and the sale of memorials market is the tied product.

Before actually pleading that there is an *illegal* tying arrangement that is anticompetitive, Clark must plead sufficient facts to plausibly suggest that a tie exists. *See T. Harris Young & Associates, Inc. v. Marquette Elecs., Inc.*, 931 F.2d 816, 822 (11th Cir. 1991) ("Only after the existence of a tie is shown is it necessary to determine whether an *illegal* tying arrangement exists."). Regarding the tie of installation services to burial lots, Clark pleaded that "[u]nder the Defendants' exclusive installation policies, independent memorial dealers, including the Plaintiff, can no longer prepare foundations for monuments and markers which these independent dealers sell to their customers." (Doc. 1 at 13 ¶ 49.) While the SCI Defendants contend that other installers can install memorials at Elmwood and only Clark has been excluded, the allegations in the complaint suggest that all independent memorial dealers have been prohibited from installing memorials at Elmwood. At this stage of the litigation, Clark has plausibly alleged that the purchaser of a burial lot at Elmwood must also buy

installation services from the SCI Defendants.

Similarly, Clark has arguably alleged that memorials and installation are tied. Clark pleaded that the imposed installation charges "prevent families from memorializing the last resting place of their loved ones at a cost within their economic means." (Doc. 1 at 11 ¶ 44(a).) Generally, for a tie to exist, "a seller must *withhold* product A unless the buyer also selects product B." *T. Harris Young & Assoc., Inc.*, 931 F.2d at 822 (11th Cir. 1991). Clark has not alleged that the SCI Defendants are actually withholding installation services, the tying product, unless a customer also purchases a memorial from the SCI Defendants.[5] However, it may be possible that Clark can allege that the installation charges are such that a consumer essentially has no choice but to choose an SCI memorial. *See Florida Monument Builders v. All Faiths Memorial Gardens*, 605 F. Supp. 1320, 1322 (S.D. Fla. 1984) (suggesting that use of rules and regulations that "either mandate the combined sale or impose severe burdens on those who would choose not to make the combined purchase" may constitute a tie even though it was ultimately not an illegal tie based on the market analysis).

However, the existence of a tie is the beginning, and not the end, of the inquiry.

---

[5] Clark pleaded that it has 28 contracts with customers who have ordered memorials not yet installed and that six of these have been delivered to Clark and are available for immediate installation. However, Clark has not pleaded facts as to suggest that SCI refuses to install memorials even after Clark has paid the installation fees.

*See  T. Harris Young & Assoc., Inc.*, 931 F.2d at 822. The test for an anticompetitive, illegal tying arrangement has been defined in various ways, but the standard elements include the following: "(1) two separate products (the tying and the tied product; (2) sufficient economic power in the tying market to coerce purchase of the tied product; (3) involvement of a not insubstantial amount of interstate commerce in the tied market; and (4) anticompetitive effects in the tied market." *Sulmeyer*, 515 F.2d at 844. "The key to such an arrangement's anticompetitiveness (and thus its illegality) is the seller's ability to *force* buyers to purchase one product in the package, the tied product, by virtue of the seller's control or dominance over the other product in the package, the tying product." *Tic-X-Press, Inc. v. Omni Promotions Co. of Ga.*, 815 F.2d 1407, 1414 (11th Cir. 1987). The ability to coerce consumers is premised on the "seller ha[ving] appreciable economic power in the tying product market." *Eastman Kodak Co.*, 504 U.S. at 462, 112 S. Ct. at 2079 (internal quotation marks omitted).

### a.    Tying Installation Services to Burial Lots

Clark's first tying claim is premised on the SCI Defendants' alleged dominance in the burial lot market.  As with monopolization and attempted monopolization claims generally, the Court's analysis must begin with whether Clark properly pleaded the relevant product and geographic markets. *See Thompson v. Metropolitan Multi-List,*

*Inc.*, 934 F.2d 1566, 1572 (11th Cir. 1991) (determining whether a relevant market was properly defined before evaluating whether there was a tying arrangement). The complaint alleges that "burial lots" are a tying product market for antitrust purposes.[6] Clark pleaded generally that "[t]he relevant geographic market is the metropolitan Birmingham area." (Doc. 1 at 10 ¶ 40.) Although that portion of the complaint appeared to define the geographic market for installation services, the Court reads this as an attempt to define the geographic market for burial lots as well.[7] A cemetery does

---

[6] The Court questions whether Clark has sufficiently defined the tying product market. *See Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1503 (11th Cir. 1985) (defining the *prima facie* elements of a tying claim to require a showing of market power within the "tying product market"). Cremations, for example, are functionally interchangeable products with burials in that both are accepted ways to handle a body after a person has died. *See U.S. Anchor Mfg.*, 7 F.3d at 995-996 (evaluating functional interchangeability of anchors but noting that facts ultimately showed that consumer demand was separate). A well-pleaded product market is typically defined based on consumer behavior. *See Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1337 (11th Cir. 2010). Clark has not pleaded any facts to suggest that consumers view burial lots as a product market separate and distinct from other competing product. Without additional facts to suggest why Clark has defined the product market this way, the Court cannot determine that the product market it has pleaded is in fact plausible. *See id.* at 1336 (stating that to survive a motion to dismiss antitrust plaintiffs must plausibly define the contours of the product market).

[7] The portion of Clark's complaint dedicated to defining the "Relevant Market and Product Service" appears to only attempt to define a market for "memorial installation services." (Doc. 1 at 10.) However, Clark also directs the Court to various "cemetery cases" that it claims support its antitrust theories in this case. These cases tend to define the geographic market in multiple areas as either a metropolitan area or a county. *See Monument Builders of Greater Kansas City, Inc. v. Am. Cemetery Ass'n of Kansas*, 891 F.2d 1473, 1476 (10th Cir. 1989) (emphasizing that complaint alleged tying in "the Kansas City area"), *Rosebrough Monument Co. v. Mem'l Park Cemetery Assoc.*, 666 F.2d 1130, 1143 (8th Cir. 1981) (noting that "the exclusive foundation preparation policy, upon which [the plaintiff] bases its claim, is uniformly followed by nearly all of the cemeteries in St. Louis"), *and Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1211 (9th Cir. 1977) (describing cemetery and memorial markets in Lane County, Oregon).

not generally constitute its own geographic market. *Mich. Div.-Monument Builders of North America v. Mich. Cemetery Assoc.*, 524 F.3d 726, 735 (6th Cir. 2008) (affirming dismissal under Rule 12(b)(6) of an antitrust claim where the pleaded geographic market was each individual cemetery in a state). Although a cemetery may have control within its borders, "each individual cemetery has nothing close to exclusive control over burial lots outside of the four corners of its own land." *Id.* at 734. However, Clark has not pleaded sufficient facts to suggest that the geographic market in burial lots is limited to the Birmingham metropolitan area.

In order to survive a 12(b)(6) motion to dismiss, "antitrust plaintiffs . . . must present enough information in their complaint to plausibly suggest the contours of the relevant geographic and product markets." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1337 (11th Cir. 2010). Here, cemetery owners in the Birmingham area may compete in a broader geographic area.  For example, a consumer living outside Birmingham who was born in Birmingham may choose to be buried in Birmingham. Similarly, a consumer currently living in Birmingham may choose among cemeteries located in Birmingham and cemeteries in other cities where he or she has lived. If Clark pleaded facts about consumer demand in burial lots, the Court would have to treat those facts as true. *See Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965. However, the

Court cannot infer that Clark has pleaded a plausible geographic market without some facts regarding consumer behavior. *See Jacobs*, 626 F.3d at 1338 (noting that basic questions about consumer behavior are "crucial to understanding whether a separate market exists" in the product context).

Moreover, even if the Court accepts that Clark has plausibly defined the relevant product market as burial lot sales in the Birmingham metropolitan area, Clark has not pleaded any facts to show that the SCI Defendants hold market power in the burial lots market. As with monopolization claims, market power in a tying claim frequently requires an analysis of market share. *See, e.g., Jefferson Parish Hospital District No. 2*, 466 U.S. at 26-27, 104 S. Ct. at 1565-1566 (noting that a hospital lacked "dominance" in a geographic area when 70% of a parish's residents chose other hospitals). Clark has not alleged an actual percentage or relative percentage of this market that the SCI Defendants hold. *See Monument Builders of Greater Kansas City, Inc. v. Am. Cemetery Ass'n of Kansas*, 891 F.2d 1473, 1476 (10th Cir. 1989) (noting that the complaint alleged that group of 30 cemetery owners possessed 70-75% of the burial market).

Moreover, Clark has not pleaded any facts from which the Court could infer market power. Clark pleaded that SCI owns 1,437 funeral service locations, 374

cemeteries in North America, and nine cemeteries in Alabama.  Each of these facts is irrelevant to the Birmingham geographic market.  Clark pleaded that the SCI Defendants own four cemeteries in the Birmingham metropolitan area. Clark did not provide any facts regarding the total number of cemeteries in the Birmingham area. Moreover, even if Clark had done so, this is irrelevant to the specific product market that it has defined—burial lots. Clark could own a large number of cemeteries with a small number of available burial lots, and another cemetery owner with one large, empty cemetery would actually possess the dominant position in the burial lots market.

In some cases, land has been considered so unique that it can serve as evidence of market power even if the landholder lacks a dominant market share. *See N. Pac. Ry. Co. v. U.S.*, 356 U.S. 1, 7, 78 S. Ct. 514, 519 (1958) (noting in a tying case that the tying market "land was strategically located in checkerboard fashion amid private holdings and within economic distance of transportation facilities"). However, in order for a product to be so unique that it conveys market power, the seller must have "some advantage not shared by his competitors in the market for the tying product." *U.S. Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. 610, 620, 97 S. Ct. 867-868 (1977).

Clark has not alleged sufficient facts to suggest that Elmwood is so unique as to

convey market power. Clark has alleged the following regarding Elmwood and SCI's business in Birmingham:

> 12.   Established in 1900, Elmwood Cemetery is one of four cemeteries now owned by SCI Alabama in the Birmingham metropolitan area. The cemetery comprises roughly 500 acres, provides the final resting place for over 200,000 persons and as of 2002 was ranked as the 12th largest cemetery in the United States.

(Doc. 1 at 5 ¶ 12.) Clark also suggested that SCI's general policy is to acquire "heritage properties." None of these facts suggest that Elmwood offers the SCI Defendants a unique advantage not shared by other competitors in the burial lots market. Regarding Elmwood's age, Clark has not pleaded that Elmwood is either one of the only cemeteries of that age with available burial lots or that burial lots in an older cemetery are preferred by consumers to a burial lot in a newer cemetery. *Cf. Tic-X-Press, Inc. v. Omni Promotions Co. of Ga.*, 815 F.2d 1407, 1420 (11th Cir. 1987) (noting that an arena was a unique facility for musical concerts because it was the only enclosed facility capable of exceeding 4,000 people). Similarly, Clark did not actually plead that Elmwood is a "heritage property." Even if Clark had done so, it has not pleaded that Elmwood is the only "heritage property" in Birmingham or that "heritage properties" are more desirable to consumers than other cemeteries. *See*

*Breau Bros. Farms, Inc. v. Teche Sugar Co.*, 21 F.3d 83, 87-88 (5th Cir. 1994) (evaluating market power of sugar cane land in a Louisiana parish and rejecting a theory that every owner of sugar cane land in the parish possessed market power).

From these facts, the only unique feature the Court could possibly infer about Elmwood is its size. However, Clark has not pleaded any facts to suggest that consumers prefer being buried in a large cemetery as opposed to a smaller one. It is unreasonable to expect, without supporting facts, that consumers would simply choose an unattractive package from Elmwood instead of simply choosing another cemetery. *See Baxley-DeLamar Monuments, Inc. v. American Cemetery Assoc.*, 938 F.2d 846, 851 (8th Cir. 1991) ("Cemetery lots are of course unique, as all land is unique, but the mere fact that the tying product is real estate does not convey market power.")

Thus, without market power in the tying product market, there is no anticompetitive conduct because the tying arrangement is not illegal. *See Jefferson Parish Hosp. District No. 2*, 466 U.S. at 25, 104 S. Ct. at 1565 (noting that "there is nothing inherently anticompetitive about packaged sales"). In *Jefferson Parish*, the Court determined that although a hospital required all patients at that hospital to use specified anesthesiological services, "[i]f no forcing is present, patients are free to enter a competing hospital and to use another anesthesiologist." *Id.* Here, a consumer

who does not want to use the SCI Defendants' installation services is free to select a cemetery other than Elmwood. *See N. Pac. Ry. Co.*, 356 U.S. at 6-7, 78 S. Ct. at 519 ("As a simple example, if one of a dozen food stores in a community were to refuse to sell flour unless the buyer also took sugar it would hardly tend to restrain competition in sugar if its competitors were ready and able to sell flour by itself.") There is no illegal tying arrangement. Insofar as Clark's antitrust claim is premised on a tie between burial lots and installation services, the claim is due to be dismissed.

### b.    Tying Sale of Memorials to Installation Services

Clark's second tying claim is premised on its allegation that the SCI Defendants have exercised power in installation services to force consumers to purchase an SCI memorial. As Clark has pleaded this claim, it fails for the same reasons as the first tying arrangement. Clark, when pleading the market for memorial installation services alleged that "[t]he relevant geographic market is the metropolitan Birmingham area." (Doc. 1 at 10 ¶ 40.)

Assuming that Clark properly defined the relevant market, Clark has not pleaded any facts to show that the SCI Defendants possess market power in the installation market for greater Birmingham. In order to show market power, Clark would need to plead facts suggesting that the SCI Defendants either have market

power in the broader market outside Elmwood or that so many installations are performed at Elmwood that the exclusive installer at Elmwood would have market power in the broader Birmingham market. *See Jefferson Parish Hospital District No. 2*, 466 U.S. at 18, 104 S. Ct. at 1561 ("[A]ny inquiry into the validity of a tying arrangement must focus on the market or markets in which the two products are sold, for that is where the anticompetitive forcing has its impact.") Although Clark pleaded that it sold roughly 122 monuments to be used at Elmwood in 2012, it did not plead how many installations it performed or any facts to suggest that installations at Elmwood are a major part of the installations in Birmingham generally.[8] The complaint also provided no indication as to how many installations the SCI Defendants performed, both at Elmwood and across Birmingham generally.  Finally, Clark did not plead that the SCI Defendants' installation services provide them a unique advantage that might convey market power—in fact they pleaded that the SCI Defendants' installation services are inferior to Clark's. Thus, Clark has not alleged a plausible tying claim on this basis.

However, in deference to Clark on a 12(b)(6) motion, the Court reads the complaint as an attempt to allege a "lock-in" claim similar to that of *Eastman Kodak*.

---

[8] Clark pleaded it averaged selling a memorial for Elmwood every three days in 2012, which means that it sold roughly 122 memorials.

In *Eastman Kodak*, a manufacturer of copying machines, Kodak, provided replacement parts for those machines along with servicing of the machine. 504 U.S. at 455, 112 S. Ct. at 2076. A group of independent servicers known as ISOs competed with Kodak in providing service. *Id.*[9] Kodak restricted access to its parts, forcing many ISOs out of business. *Id.* at 458, 112 S. Ct. at 2078. The ISOs sued Kodak, contending that Kodak tied its service to the sale of its parts. *Id.* at 459, 112 S. Ct. at 2078. The Court rejected Kodak's contention that competition in the copier market precluded any finding of monopoly power in the aftermarkets. *Id.* at 466-467, 112 S. Ct. at 2082. When there are "significant information and switching costs" associated with the aftermarkets, competition in the initial market may not be enough to avoid antitrust liability. *Id.* at 473, 112 S. Ct. at 2085.

The complaint contains an allegation that "[t]he SCI Defendants have the power to exclude competition in the installation of memorials market at Elmwood Cemetery." (Doc. 1 at 13 ¶ 48.) This could be read as a contention that Elmwood is the initial market, and the installations and sales of memorials are actually two aftermarkets. However, an essential element of a lock-in claim is a change in policy in

---

[9] The ISOs had different arrangements with customers. Some customers purchased their parts from Kodak and hired the ISOs purely for service. Others purchased both service and parts from the ISOs. 504 U.S. at 458, 112 S. Ct. at 2077.

the after-markets after a consumer has made a purchase in the initial market. *Michigan Division-Monument Buidlers of North America*, 524 F.3d at 737 (stating that "a lock-in claim requires specific factual allegations in the complaint that the defendant either changed its rules after the initial sale was made or concealed its rules from its customers"); *PSI Repair Services, Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997) (noting that "the change in policy in *Kodak* was the crucial factor in the Court's decision"); *Lee v. Life Ins. Co. of North America*, 23 F.3d 14, 20 (1st Cir. 1994). Clark's complaint alleged that the SCI Defendants began charging installation costs in June 2013 and changed the installation costs in July 2013. However, Clark's complaint also alleges that "[b]eginning at some time *prior to June 2013*, Defendants began informing consumers that if they choose to purchase a monument or memorial from an independent memorial dealer, they will be charged installation fees." (Doc. 1 at 11 ¶ 43 (emphasis added).) Thus, Clark's facts actually foreclose a true "lock-in." While the change in policy may have surprised Clark, the facts indicate that potential *consumers* were told in advance of the changes. *See Eastman Kodak*, 504 U.S. at 473-478, 112 S. Ct. at 2085-2088 (focusing on the impact of a change in policy on consumers).

Although Clark alleges that it has existing contracts for memorials that have not

yet been installed at Elmwood, it does not plead specific reasons why the memorials are yet to be installed. It has not alleged that these consumers entered into contracts unaware that their decision to purchase a memorial from an independent dealer would subject them to installation fees that are possibly greater than they would be charged if they purchased an SCI memorial. Thus, Clark has not alleged any facts to suggest expensive switching costs for consumers. *See Maris Distributing Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1223 (11th Cir. 2002).

Moreover, Clark has failed to plead any facts that suggest information costs similar to those in *Eastman Kodak*. Clark pleaded that "[b]ecause Defendant SCI Alabama does not publicize its installation charges, a consumer is less informed to insure that competitive prices are charged for installation of memorials." (Doc. 1 at 9 ¶ 33.) However, *Eastman Kodak* involved "[l]ifecycle pricing of complex, durable equipment." 504 U.S. at 473, 112 S. Ct. at 2085. In the service and parts aftermarkets, a consumer of copiers would have to price its need for these two items throughout the life of the machine. Furthermore, "lifecycle costs will vary from customer to customer with the type of equipment, degrees of equipment use, and costs of down-time." *Id.* at 474, 112 S. Ct. at 2086. Here, the only variable in the SCI Defendants' pricing is

either the type or size of the memorial.[10] Although it might be easier for consumers if SCI Alabama published installation cost information, Clark has not alleged that installation pricing information is either difficult or impossible to acquire like the pricing information in *Eastman Kodak*. 504 U.S. at 473, 112 S. Ct. at 2086.

Thus, Clark has not pleaded anticompetitive conduct that would sustain a monopolization or attempted monopolization claim in either memorial installations or memorial sales. The Court also notes that insofar as the complaint attempts to state a monopolization or attempted monopolization of the sale of memorials market, such a claim would also fail because Clark has not defined a relevant geographic market in the sale of memorials market.

The Court reads Clark's complaint to again allege that the Birmingham metropolitan area is the relevant geographic market. However, Clark provides no factual support for this assertion, and thus the Court cannot determine whether these are the plausible contours of a geographic market. *See Jacobs*, 626 F.3d at 1336. There is no indication that consumers in Birmingham would only purchase a memorial from a brick-and-mortar dealer in Birmingham. Clark alleges that memorial materials are

---

[10] In previous pricing regimes, the SCI Defendants allegedly charged costs based on whether the item installed was a monument or memorial. However as of July 2, 2013, they allegedly charged $0.65 per square inch.

regularly shipped to Alabama from other states. It is equally reasonable that a consumer would purchase a memorial online from another city or state and then have that finished memorial shipped to Birmingham.

Clark has not pleaded any facts related to market share in the memorial sales market. It only pleaded generally that the SCI Defendants "sell cemetery-related merchandise and services, including stone monuments and markers, bronze memorials, merchandise installations, and burial openings and closings." (Doc. 1 at 5 ¶ 13.) In its brief, Clark actually states that *it*, not SCI, is "the largest monument dealer in the City of Birmingham." (Doc. 13 at 8.) This fact, if anything, suggests that Clark, and not SCI, may hold substantial economic power in the sale of memorials market.

Both monopolization and attempted monopolization claims require substantial market share. *See McGahee v. N. Propane Gas Co.*, 858 F.2d 1487, 1506 (11th Cir. 1988) (noting that hold of 60-65% of market share created a dispute of fact as to whether an entity had a dangerous probability of achieving monopoly power for an attempted monopolization claim). Although Clark contends that various "cemetery cases" support its position, these cases also involved substantial market share. *See Monument Builders of Greater Kansas City, Inc.*, 891 F.2d at 1482 (examining complaint on a

12(b)(6) motion and noting that it alleged that the thirty cemeteries at issue had a 70-75% market share), *Rosebrough Monument Company v. Memorial Park Cemetery Association*, 666 F.2d 1130, 1136 (8th Cir. 1981) (noting that virtually all of the fifty cemeteries in the St. Louis metropolitan area had an exclusive foundation policy), *and Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1211 (9th Cir. 1977) (observing that eight cemeteries in a county performed 78% of interments there over a nine-year period). Thus, Clark's tying claims are due to be dismissed, and the Court need not consider whether they should have been brought under § 1 or § 2 of the Sherman Act.

### ii.    Refusal to Deal

Clark also contends that it has pleaded sufficient facts on a refusal to deal claim in order to survive a motion to dismiss.  Specifically, Clark claims that it has pleaded that Elmwood is an "essential facility," such that the Defendants must allow Clark access to Elmwood to install its memorials.

"In the absence of any purpose to create or maintain a monopoly, the [Sherman Act] does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *U.S. v. Colgate & Co.*, 250 U.S. 300, 307, 39 S. Ct. 465, 468 (1919). Although the antitrust laws recognize a broad right of freedom in

dealing, the right is not unqualified. *Lorain Journal Co. v. U.S.*, 342 U.S. 143, 155, 72 S. Ct. 181, 187 (1951). In *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S. Ct. 2847 (1985), the Supreme Court affirmed a jury verdict that the owner and operator of three of four mountains in Aspen had monopolized the skiing market by refusing to continue dealing with the fourth mountain so that skiers could purchase a single skiing ticket package providing access to all four mountains.

However, "*Aspen Skiing* is at or near the outer boundary of § 2 liability." *Verizon Commc'ns., Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409, 124 S. Ct. 872, 879 (2004) ("*Trinko*"). Indeed, the Eleventh Circuit has recognized that "[t]wo theories exist upon which to predicate a unilateral refusal to deal claim: (1) the intent test and (2) the essential facility test." *Morris Commc'ns. Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1294 (11th Cir. 2004) (citing *Mid-Texas Commc'ns. Sys., Inc. v. AT&T*, 615 F.2d 1372, 1387 n. 12 (5th Cir. 1980)).[11] The essential facility test has been

---

[11] In its brief, Clark contends only that Elmwood is an essential facility. Thus, the Court need not consider the "intent test." *See Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11ᵗʰ Cir. 2000) ("[F]ailure to brief and argue [an] issue during the proceedings before the district court is grounds for finding that the issue has been abandoned.") Under this test, a monopolist may be liable for refusing to deal if it cannot present valid justifications for its actions. *Mid-Texas Communications Systems, Inc. v. Am. Tel. & Tel. Co.*, 615 F.2d 1372, 1388 (5th Cir. 1980). However, as the Court noted extensively in its discussion of monopoly power and the tying claim above, Clark has failed to allege sufficient facts to suggest that the Defendants even possess market power in a relevant tying market. Thus, they are not a "monopolist," either. *See Eastman Kodak*, 504 U.S. at 481, 112 S. Ct. at 2090 (stating that monopoly power requires something greater than market power).

recognized in various circuit courts, but it has not been recognized in the Supreme Court. *Trinko*, 540 U.S. at 410-411, 124 S. Ct. at 880-881.

The Eleventh Circuit has recognized a limited version of the essential facilities doctrine where "a company that has exclusive control over a facility essential to effective competition may not deny potential competitors access to that facility on reasonable terms and conditions if to do so would create or maintain monopoly power in the relevant market." *Morris Communications Corp.*, 364 F.3d at 1294.[12] At a minimum, there must be both an "essential facility" and a denial of access to that facility. *See Trinko*, 540 U.S. at 411, 124 S. Ct. at 881 (noting that if such a doctrine exists, there must be a denial of access to an essential facility).

Clark has pleaded that Elmwood is a large cemetery located in Birmingham, but it has not pleaded facts to suggest that it is actually essential to competing in the installation or sale of memorials markets in the Birmingham area. In order for a facility

---

[12] In its brief, Clark's counsel directs the Court to a four-part "essential facilities" test, citing *Consol. Gas Co. v. City Gas Co.*, 665 F. Supp. 1493, 1533 (S.D. Fla. 1987).  (Doc. 13 at 16.) They further indicate that this decision was affirmed, citing *Consol. Gas Co. of Fla., Inc. v. City Gas Co. of Fla.*, 912 F.2d 1262 (1990). (*Id.*) However, Plaintiff's counsel neglected to inform the Court that the Eleventh Circuit opinion was subsequently vacated by the Supreme Court, and the District Court opinion counsel cites was then vacated by the Eleventh Circuit. *See City Gas. Co. of Fla. v. Consol. Gas Co. Of Fla., Inc.*, 499 U.S. 915 (1991) (stating that "[t]he judgment is vacated and the case is remanded to the United States Court of Appeals for the Eleventh Circuit with directions to dismiss"), *and Consol. Gas Co. of Fla., Inc. v. City Gas Co. of Fla.*, 931 F.2d 710 (11th Cir. 1991) (ordering that "the Findings of Fact and Conclusions of Law entered on July 24, 1987, are vacated and the cause is remanded with instructions to enter an order dismissing the case with prejudice").

to actually be "essential," there must not be available alternatives. *See U.S. v. Terminal R.R. Assoc. of St. Louis*, 224 U.S. 383, 397, 32 S. Ct. 507, 510-511 (1912) ("[I]t is, as a practical matter, impossible for any railroad company to pass through, or even enter St. Louis, so as to be within reach of its industries or commerce, without using the facilities entirely controlled by the terminal company.") Based on these facts, Clark can continue to compete with the Defendants by offering to make and install its memorials at other cemeteries in the Birmingham area. The complaint itself establishes that SCI owns four cemeteries in Birmingham, and Clark has not alleged that it was excluded from serving these cemeteries in either the design or installation of memorials. Moreover, Clark has not pleaded that it is precluded from arranging to manufacture and install memorials at other cemeteries in Birmingham owned by entities other than SCI.

Thus, Clark's unilateral refusal to deal claim also fails to establish the type of anticompetitive conduct required to state a claim of either monopolization or attempted monopolization. Since neither of Clark's theories states a claim on which relief can be granted, the antitrust claims are due to be dismissed.

**B.      State Law Claims**

In addition to the federal antitrust claims, Clark also alleged violations of the

Alabama Antitrust Act and several state law torts. The Defendants urge the Court to dismiss these claims as well under Rule 12(b)(6). However, the Court must first consider whether to exercise supplemental jurisdiction over these claims. *See Ardestani v. U.S. Dep't of Justice, Immigration & Naturalization Serv.*, 904 F.2d 1505, 1515 (11th Cir. 1990) (noting that district courts must dismiss claims when it lacks subject matter jurisdiction). This case implicates the Court's supplemental jurisdiction, codified at 28 U.S.C. § 1367 ("§ 1367"). "The statute reflects a dichotomy between a district court's power to exercise supplemental jurisdiction, § 1367(a), and its discretion not to exercise such jurisdiction, § 1367(c)." *Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 742 (11th Cir. 2006).

Section 1367(a) authorizes supplemental jurisdiction when claims "form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Claims are part of the same case or controversy if they "'derive from a common nucleus of operative fact.'" *Upper Chattahoochee Riverkeeper Fund, Inc. v. City of Atlanta*, 701 F.3d 669, 679 (11th Cir. 2012) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725, 86 S. Ct. 1130, 1138 (1966)). The Court must "take the nucleus of facts on which the federal question claims are based and compare it to the nucleus of facts on which the state law claims are based." *Id.* The claims here are

generally part of the same case or controversy. The state and federal antitrust inquiries are essentially identical. *See Vandenberg v. Aramark Educ. Servs., Inc.*, 81 So. 3d 326, 333 (Ala. 2011) (noting that federal law on monopolization governs antitrust actions under state law). Clark has used identical facts to attempt to state claims under both state and federal antitrust laws. Moreover, the state law tort claims are also based on the same common nucleus of facts—Clark has been prohibited from installing memorials at Elmwood, and that has harmed its business.

However, this is the beginning, and not the end, of the inquiry. *See Parker*, 468 F.3d at 743. Under § 1367(c), the district courts may decline to exercise supplemental jurisdiction over a state law claim if:

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). Any one of these grounds is reason to decline jurisdiction. *Parker*, 468 F.3d at 743. Here, the Court should dismiss all state claims for lack of supplemental jurisdiction because it has dismissed all pending federal claims. *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004) ("We have encouraged

district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial."). The Court has the discretion to dismiss the remaining state law claims when it has properly granted a Rule 12(b)(6) motion to dismiss. *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1305 n. 2 (11th Cir. 2009). Thus, the remaining state law claims are due to be dismissed as outside the Court's supplemental jurisdiction.

## IV.   Conclusion

For the reasons discussed above, the Defendants' motion to dismiss (Doc. 7) is due to be granted, and all pending claims are due to be dismissed. The federal antitrust claims are due to be dismissed for failure to state a plausible claim for relief under Rule 12(b)(6), and the Court will decline to exercise supplemental jurisdiction over the pending state law claims.

A separate order will be entered.

Done this 14th day of January 2014.

_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
174256